

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA )
)
v. ) Case No. 1:20-CR-84
)
GARRISON KENNETH COURTNEY, )
  also known as )
    "Garrison Kenneth Pierson Courtney," )
    "Glenn Nelson," )
    "Glenn Nielson," )
    "Gary Pierson," )
    "Garrison Pierson," )
)
        Defendant. )

## STATEMENT OF FACTS

The United States and the defendant, GARRISON KENNETH COURTNEY, also known

as "Garrison Kenneth Pierson Courtney," "Glenn Nelson," "Glenn Nielson," "Gary Pierson,"

"Garrison Pierson," (hereinafter, "COURTNEY"), stipulate and agree that the following

allegations are true and correct, and further stipulate and agree that at trial, the United States

would have proven the following facts beyond a reasonable doubt with admissible and credible

evidence:

## COUNT ONE

### (Wire Fraud)

1.    Defendant GARRISON KENNETH COURTNEY, also known as "Garrison

Kenneth Pierson Courtney," "Glenn Nelson," "Glenn Nielson," "Gary Pierson," "Garrison

Pierson," (hereinafter, "COURTNEY") was a resident of Alexandria, Virginia, within the

Eastern District of Virginia.  From in or about 2005 through in or about 2009, COURTNEY was

employed as a public affairs officer for the Drug Enforcement Administration ("DEA"). At all times after his departure from the DEA in or about 2009, COURTNEY was not an employee of the United States government. COURTNEY has never been an employee, officer, or agent of, or otherwise affiliated with, the Central Intelligence Agency ("CIA"). In or around 2005, COURTNEY applied for a job with the CIA. The CIA subsequently extended a conditional offer of employment to COURTNEY, but COURTNEY did not respond to that offer, which lapsed in or around 2007.

2.      The National Institutes of Health Information Technology Acquisition and Assessment Center ("NITAAC") was a federal governmental office of the National Institutes of Health, housed within the Department of Health and Human Services. NITAAC provided acquisition services through the administration of various government-wide acquisition contracts ("GWACs") that could be used by any federal civilian or Department of Defense agency to acquire information technology services, solutions, and commodities.

3.      Individual A was an individual who has never been an employee, officer, or agent of, or otherwise affiliated with, the CIA. In or around 2006, Individual A applied for a job with the CIA. The CIA subsequently extended a conditional offer of employment to Individual A, but Individual A did not respond to that offer, which lapsed in or around 2007.

4.      Individual B was a private citizen who was employed as a child anesthetist and also worked part-time in producing videos. Individual B has never been an employee, officer, or agent of, or otherwise affiliated with, the CIA.

5.      Individual C was a private citizen who was employed performing various acquisition support roles for private companies on behalf of federal agencies. Individual C has never been an employee, officer, or agent of, or otherwise affiliated with, the CIA.

2

6.     Public Official A was employed at the DEA from in or about the late 1980's until in or about December 2014. During that time, Public Official A served in various positions within the DEA's Special Operations Division.

7.     Public Official B was employed at the DEA from in or around 2005 until in or about October 2015. During that time, Public Official B served in various positions within the DEA's Office of Congressional and Public Affairs and its Office of Demand Reduction.

8.     Prior to the events of this Information, Former Public Official C had served as a high-ranking officer with the United States Navy. At all times relevant to this Information, Former Public Official C was a private citizen who was not employed by the United States government, having resigned from the Navy prior to the events at issue.

9.     Public Official D was employed as a civilian with a branch of the United States military, and was detailed to an intelligence agency of the United States government.

10.    Public Official E was employed as a non-commissioned officer with a branch of the United States military. At all times relevant to this Information, Public Official E served as the administrative assistant to Public Official D.

11.    Public Official F served as a high-ranking officer in the United States Air Force.

12.    Public Official G was employed by the Office of the Director of National Intelligence.

13.    Company A was a corporation based in Reston, Virginia, within the Eastern District of Virginia, that provided information technology program management services, cybersecurity support, data analytics, and other services to various agencies of the United States government.

14.     Company B was a Delaware corporation with offices in Herndon, Virginia, within the Eastern District of Virginia, that provided security services to various agencies of the United States government.

15.     Company C was a corporation based in Maryland that provided networking services, storage solutions, and enterprise application development, among other things, to various agencies of the United States government.

16.     Company D was a corporation based in Alexandria, Virginia, within the Eastern District of Virginia, that performed applications systems development work for various agencies of the United States government.

17.     Company E was a corporation based in Herndon, Virginia, within the Eastern District of Virginia, that performed systems engineering and integration, cyber security, data analytics, and other services for various agencies of the United States government.

18.     Company F was a corporation based in Gainesville, Virginia, within the Eastern District of Virginia, that provided information technology and intelligence consulting services to various agencies of the United States government.

19.     Company G was a corporation based in Alexandria, Virginia, within the Eastern District of Virginia, that provided cyber, information technology, contingency planning, and training services to the Department of Defense and other federal agencies.

20.     Company H was a corporation based in Ashburn, Virginia, within the Eastern District of Virginia, that provided security support services, data center solutions, and other services to various agencies of the United States government.

4

21.     Company I was a corporation based in McLean, Virginia, within the Eastern District of Virginia, that provided cloud computing and cybersecurity services, among other things, to various agencies of the United States government.

22.     Company J was a corporation based in Illinois that served as a value-added-reseller of technology products and services to governmental agencies.

23.     Company K was a corporation based in Vienna, Virginia, within the Eastern District of Virginia, that provided management, engineering, and information technology services to various agencies of the United States government.

24.     Company L was a not-for-profit corporation based in New York, with offices located in Arlington, Virginia, within the Eastern District of Virginia, and elsewhere, that provided scientific and engineering research services to defense and intelligence agencies of the United States government.

25.     Company M was a corporation based in Herndon, Virginia, within the Eastern District of Virginia, that provided investment financing.

## COUNT 1

### (Wire Fraud)

26.     Paragraphs 1 through 25 of this Information are re-alleged and incorporated in this Count as if fully set forth herein.

27.     Beginning no later than in or about 2012, and continuing through at least in or about 2016, in the Eastern District of Virginia and elsewhere,

GARRISON KENNETH COURTNEY,
also known as "Garrison Kenneth Pierson Courtney,"
also known as "Glenn Nelson,"
also known as "Glenn Nielson,"
also known as "Gary Pierson,"
also known as "Garrison Pierson,"

5

defendant herein, did knowingly devise and intend to devise a scheme and artifice to defraud and
to obtain money and property by means of materially false and fraudulent pretenses,
representations, and promises, and by the concealment of material facts.

### Purpose and Object of the Scheme

28.     It was the purpose and object of the scheme for COURTNEY to obtain money
and property through materially false and fraudulent pretenses, representations, and promises,
and by the concealment of material facts.

### Manner and Means of the Scheme

In furtherance of the scheme to defraud, and to accomplish its unlawful objects, the
following manner and means were used, among others:

29.     COURTNEY knowingly and falsely claimed that he and Individual A were covert
employees, agents, or operatives of, or otherwise affiliated with, the CIA. At times,
COURTNEY made this claim explicitly. At other times, COURTNEY implied that he and
Individual A were so employed, by using common euphemisms for the CIA, or by using
innuendo purposefully calculated to convey the false impression that he and Individual A were
employed by or otherwise affiliated with the CIA. In truth, as COURTNEY knew, he and
Individual A were neither employed by nor affiliated with the CIA in any way.

30.     COURTNEY knowingly and falsely claimed that he was leading, assigned to, or
otherwise involved in a highly classified program operated by various governmental agencies
within the United States defense and intelligence communities, which COURTNEY sometimes
referred to as a "task force." Though his false story varied from time to time, typically
COURTNEY claimed that this classified program or task force had been established personally
by high-level officials of the United States government, including the President of the United

6

States, the Attorney General, the Director of National Intelligence, the Undersecretary of Defense for Intelligence, the Administrator of the Drug Enforcement Administration, or some combination of those officials. At times, COURTNEY falsely claimed that the classified program was to support special operations forces of the United States operating covertly in Africa. At other times, COURTNEY falsely claimed that the objective of this supposed classified program or task force was to enhance the intelligence-gathering capabilities of the United States government that had been weakened by the public disclosure of classified information by a former contractor who had been working for the intelligence community. As described by COURTNEY, the classified program or task force would operate in concert with private companies who would provide goods or services to various defense and intelligence agencies of the United States government. As COURTNEY knew, the specific classified program or task force that he described did not exist, and he did not work for, had not been assigned to, and did not otherwise represent any similar program or task force.

31.     COURTNEY invented various code names that he used to refer to the supposed classified program or task force that he had concocted, to perpetuate the illusion that the program was real and highly classified. The fake code names utilized by COURTNEY included "Alpha214" and "A214," among other false names.

32.     COURTNEY approached numerous private companies that did or were seeking to do business for the defense or intelligence agencies of the United States government, including Company B through Company L. COURTNEY would then falsely claim or deliberately imply that he and Individual A were covertly employed by or otherwise affiliated with the CIA, and that he and Individual A were involved in some variation of the classified program described above. COURTNEY would further explain that the private company needed to hire

7

COURTNEY and Individual A and place them on the company's payroll, or otherwise pay him and Individual A as independent contractors. (In the case of Company A, where COURTNEY and Individual A already were employed, COURTNEY explained that the company needed to continue to pay them under this arrangement.) COURTNEY knowingly and falsely represented that the private company needed to pay him and Individual A to create what COURTNEY described as commercial cover, *i.e.*, to mask his and Individual A's supposed affiliation with the CIA and make it appear that they were private citizens with no ties to the United States government. COURTNEY would further represent that the private company would be reimbursed by the CIA in the future for payments made to COURTNEY and Individual A under this arrangement. COURTNEY often claimed falsely that this reimbursement would come via the award of lucrative contracts from the government to the private company.

33.    COURTNEY sought to conceal and prevent the discovery of his fraud by claiming falsely that his identity, large portions of his conduct, and information associated with the alleged task force were highly classified. In truth, these matters were not classified, and COURTNEY knowingly used his bogus claims of classification to keep his intended and actual victims in the dark, to deflect suspicion, and to prevent detection of his fraud by victims, witnesses, and law enforcement.

34.    COURTNEY caused his victims, intended victims, and other potential witnesses to sign fraudulent non-disclosure agreements purporting to forbid those individuals from speaking about or otherwise revealing information that COURTNEY had claimed was classified. COURTNEY passed this off as an effort to protect sensitive information that could damage national security if disclosed. COURTNEY's true intent in requiring individuals to sign such fraudulent non-disclosure agreements was to maintain the illusion that he was a covert

8

intelligence officer, and to prevent detection of his fraud by victims, witnesses, and law enforcement.

35.    COURTNEY often held meetings with victims, intended victims, and other individuals inside of a sensitive compartmented information facility ("SCIF"), which is a room or other facility designed to house classified information. COURTNEY did so under the false pretext of maintaining the security of the supposed classified program. In truth, COURTNEY was using the location of a SCIF to perpetuate the illusion that he was a covert intelligence officer and that the supposed classified program was real, and to prevent his victims, intended victims, and other individuals from speaking openly about, and thereby discovering, COURTNEY's fraud.

36.    When meeting with victims, intended victims, and other individuals, COURTNEY at times would search or cause those individuals to be searched, and prohibited those individuals from possessing electronic devices during meetings about the alleged classified program. COURTNEY did so under the false pretext of maintaining the security of the supposed classified program and of preventing surveillance by foreign intelligence services. In truth, COURTNEY took these steps to perpetuate the illusion that he was a covert intelligence officer and that the supposed classified program was real.

37.    COURTNEY knowingly and falsely advised victims, intended victims, and other individuals that they were under surveillance by foreign intelligence services. COURTNEY further instructed individuals to take countermeasures allegedly to protect themselves from the supposed foreign intelligence services. For example, COURTNEY instructed some individuals to limit their use of credit cards or minimize their presence on social media, purportedly to make it more difficult for foreign intelligence services to monitor those individuals' conduct.

COURTNEY advised other individuals to alter their patterns of movement or to engage in counter-surveillance, purportedly to defeat or detect surveillance by foreign intelligence services. COURTNEY advised yet other individuals to carry firearms, purportedly to protect themselves from physical threats by foreign intelligence services. In truth, COURTNEY had no basis for believing that any of these individuals was under surveillance or threat by any foreign intelligence service, and had made up these claims to perpetuate the fraudulent illusion.

38.     COURTNEY directed and encouraged the victims and intended victims of his scheme to communicate with him and each other via encrypted communications devices and applications. COURTNEY did so under the false pretext of avoiding detection or monitoring by foreign intelligence services. In truth, COURTNEY instructed his actual and intended victims to behave this way to continue to perpetuate the fraud and to evade detection and monitoring by law enforcement.

39.     COURTNEY knowingly made false claims about his prior military service to bolster the illusion that he was a covert intelligence officer. For example, COURTNEY knowingly and falsely claimed, among other things, that: (i) he had served in the United States Army during the Gulf War; (ii) he had hundreds of confirmed kills while in combat; (iii) during his supposed service in the Gulf War, he had sustained injuries to his lungs from smoke caused by fires set to Iraq's oil fields; and (iv) during his supposed service in the Gulf War, he had been injured from an explosion. In truth, as COURTNEY knew, he had never served in the Gulf War, and had first enlisted in the military only after that conflict ended. COURTNEY further knew that the breathing difficulties he encountered in truth were the result of asthma that he had aggravated while fighting forest fires in Montana.

10

40.    In a further attempt to perpetuate the illusion that he was a covert CIA officer or operative, COURTNEY knowingly and falsely claimed that in or about 2015, a hostile foreign intelligence service attempted to assassinate him by trying to poison him with ricin, after which he was rushed to the hospital. In truth, as COURTNEY knew, he was never poisoned with ricin, and had been admitted to the hospital for ordinary health issues having nothing to do with ricin, any other form of poisoning, or any attempt on his life.

41.    COURTNEY knowingly created fake and fraudulent documents purporting to grant his victims, intended victims, and others "immunity from prosecution" for their participation in the supposed classified program. These documents falsely purported to have been signed by the Attorney General, or otherwise to have been issued by the Office of the Attorney General, and claimed to confer immunity "for a period of no longer than twenty-five years or the duration of the classified project, whichever comes first." COURTNEY fabricated and distributed these documents to convince his victims and intended victims that they could follow his instructions, and to further perpetuate the fraud.

42.    COURTNEY created fake and fraudulent documents purporting to be contracts, basic ordering agreements, and task orders issued by various agencies of the United States government, that allegedly had been awarded to the companies that COURTNEY was defrauding and attempting to defraud. These purported contracts, basic ordering agreements, and task orders allegedly had been issued by federal agencies to include the United States Army's Program Executive Office Enterprise Information Systems, the United States Department of Commerce, the CIA, the National Institutes of Health, the Office of the Undersecretary of Defense for Intelligence, and by unspecified components of the Department of Defense. These fake documents allegedly were for the delivery of goods or services as a part of the supposed

11

classified program. In truth, none of these alleged contracts existed, and the fake documents had been created by COURTNEY as a ruse to perpetuate the illusion that the classified program was real, and to convince the various private companies that they should pay (or to continue to pay) COURTNEY as a part of the supposed classified program.

43.     COURTNEY knowingly used certain real public officials of the United States government, including Public Official A, Public Official B, Former Public Official C, Public Official E, Public Official F, and Public Official G, as unwitting props in his scheme to defraud. For example, COURTNEY would invite real public officials, some of whom he knew from his prior service at the DEA, to attend meetings with executives from the various private companies that COURTNEY was defrauding. Prior to those meetings, COURTNEY would ask the public officials to give generic briefings regarding the government's needs and capabilities to the executives from the private companies. Unbeknownst to the public officials, COURTNEY separately would advise the corporate executives that the public official was leading the supposed classified program. COURTNEY would then use the public official's attendance at these meetings to falsely burnish his legitimacy and the legitimacy of the supposed classified program in the eyes of the corporate executives.

44.     In furtherance of the scheme to defraud, COURTNEY also sought corruptly to influence Public Official D in the performance of his/her official duties by providing Public Official D directly and indirectly with things of value. Among other things, COURTNEY arranged for Company G and Company L, two companies that COURTNEY was defrauding and attempting to defraud, to hire Public Official D's adult child, notwithstanding that the adult child lacked relevant training or experience to perform the jobs in question. COURTNEY fraudulently convinced the victim companies to hire Public Official D's adult child in part by falsely

12

representing that doing so was part of the supposed classified program, and that the companies would be reimbursed for the salary payments made to Public Official D's adult child.

45.     COURTNEY knowingly and falsely convinced both private citizens and public officials that they had been hired by or otherwise selected to participate in the supposed classified program.  COURTNEY often accomplished this by creating fake and fraudulent documents purporting to have been issued by the Undersecretary of Defense for Intelligence or by the CIA.  These fake and fraudulent documents stated that individuals allegedly had been hired to work in, or had otherwise been selected or approved for participation in, the supposed classified program.

46.     Once COURTNEY had convinced certain private citizens that they had been selected to participate in the supposed classified program, he then directed them to assume false identities, and claimed that doing so was in furtherance of the program.  For example, COURTNEY directed Individual B to pose falsely as an official with the Department of Defense during meetings with executives from Company B, and to pose falsely as a contracting officer with the DEA during a meeting with executives from Company A.  Similarly, COURTNEY directed Individual C to pose falsely as a contracting officer with the CIA during an anticipated meeting with executives from Company A, which meeting was cancelled at the last moment. After the meeting was cancelled, COURTNEY directed Individual C to pose falsely as a contracting officer with the CIA during a telephone call with an attorney representing Company A.

47.     Once COURTNEY had convinced real public officials of the United States government that they had been selected to participate in the supposed classified program, he

13

knowingly used those individuals to falsely burnish his legitimacy and the legitimacy of the classified program. COURTNEY did so in several ways:

      a.      COURTNEY provided public officials with talking points or other scripts regarding the supposed operation of the classified program to be used when those public officials would meet with executives of the victim companies. In this way, COURTNEY falsely made it appear to the corporate executives that another public official was independently verifying COURTNEY's status as a covert intelligence operative and the legitimacy of the supposed classified program. In truth, the public official merely was echoing the false information provided to him or her by COURTNEY.

      b.      COURTNEY used public officials to confirm the existence and validity of the fake contracts, basic ordering agreements, or task orders allegedly issued by the United States government that he had fabricated, or to confirm that payment soon would be forthcoming under those fake documents. COURTNEY did so to make it appear falsely to the victim companies that another public official independently had verified the existence and validity of these documents. In truth, the public official merely was repeating the false information provided to him or her by COURTNEY.

      c.      COURTNEY instructed the public officials, when meeting with corporate executives, to emphasize the importance of safeguarding allegedly classified information, and at times to scold and even threaten corporate executives for the supposed mishandling or leaking of allegedly classified information. In so doing, COURTNEY falsely made it appear that the public official independently had verified the classified nature of the information and the victim companies' liability for mishandling or leaking that information. In truth, the public official merely was repeating the false information provided to him or her by COURTNEY.

14

      d.      COURTNEY encouraged the public officials to meet with corporate executives at governmental offices, thereby falsely conferring the appearance of legitimacy on the fake classified program.

      e.      COURTNEY convinced certain public officials to grant him access to governmental offices. COURTNEY thereafter used his presence inside of these governmental offices to falsely burnish his legitimacy in the eyes of corporate executives and other public officials.

      48.      At times, COURTNEY knowingly and falsely accused victim companies and their executives of having mishandled or intentionally leaked allegedly classified information. COURTNEY would thereafter threaten to revoke or cancel the supposed government contracts awarded under the classified program, to revoke the companies' or executives' security clearances, or to arrest and criminally prosecute the persons who supposedly had leaked or mishandled the information. In truth, the information was not classified, and COURTNEY was using these threats to deflect suspicion away from his fraud.

      49.      As the scheme unfolded, several of COURTNEY's victims began to question why they had not been reimbursed by the government for the money they had paid to COURTNEY and Individual A or for the work they had performed under the alleged contracts, basic ordering agreements, or task orders that COURTNEY had fabricated. COURTNEY frequently would deflect these questions by claiming falsely that the victims had leaked classified information or otherwise breached security, and that these security breaches delayed payment from the government. In truth, COURTNEY knew that payments were not forthcoming because the classified program did not exist and because the supposed contracts with the victim companies were forgeries.

50. When certain individuals would question or doubt COURTNEY's legitimacy, he would falsely accuse them of being spies on behalf of foreign intelligence services in a bid to discredit them. In one example of this tactic, COURTNEY falsely accused an individual of being an Iranian spy after that individual publicly accused COURTNEY of engaging in a fraud.

## COURTNEY Fraudulently Embeds Himself at NITAAC and Uses His Position to Manipulate Procurements

51. It was a further part of the scheme that COURTNEY fraudulently gained a position working at NITAAC, which he subsequently used to corrupt and attempt to corrupt federal procurements. More specifically:

a. As noted above, COURTNEY fraudulently convinced various private companies to pay him as an employee or an independent contractor under the false pretense that he was a covert intelligence operative in need of "cover" employment. The companies that COURTNEY had so defrauded included Company J and Company L.

b. After COURTNEY had been placed on Company L's payroll, COURTNEY approached governmental officials at NITAAC, falsely claimed that he was a covert employee of the CIA working on a highly classified program, and falsely represented that the CIA and other defense and intelligence community officials wanted NITAAC to serve as the contracting arm of the supposed classified program. COURTNEY claimed that in this role, NITAAC would assist the program in awarding billions of dollars' worth of classified contracts to private companies.

c. COURTNEY further advised and caused NITAAC officials to be advised that they needed to award a contract to Company L whereby Company L would supply personnel with expertise in government acquisitions and procurements to NITAAC. As pitched by

COURTNEY, NITAAC would need this support to handle the additional influx of work necessary to support the classified program.

   d. COURTNEY also fraudulently convinced NITAAC officials that this acquisition support contract should be awarded to Company L on a sole-source basis, without full and open competition. COURTNEY falsely represented to NITAAC officials that doing so was justified because of national security concerns, and convinced NITAAC officials and Public Official F to prepare and execute paperwork justifying the absence of full and open competition in the award of this contract on the basis of national security. As COURTNEY knew, there was no actual national security basis to prevent competition or to insist that this acquisition support contract be awarded to Company L, and COURTNEY had used this as a pretext to allow him to manipulate the process.

   e. Once NITAAC had awarded this acquisition support contract to Company L, COURTNEY used the contract as a basis to install himself at NITAAC, whereby he gained access to sensitive, nonpublic information about the procurements of other federal agencies being supported by NITAAC.

   f. COURTNEY thereafter used the sensitive, nonpublic information he gained from his position at NITAAC to manipulate and attempt to manipulate federal procurements, by steering and attempting to steer the award of contracts administered by NITAAC to other companies where COURTNEY was then on the payroll, including Company J. He further accomplished this by claiming falsely that national security concerns justified the award of contracts to companies without full and open competition, and by fraudulently convincing public officials to justify the absence of competition on the basis of national security concerns. As COURTNEY knew, there was no legitimate national security concern justifying

the absence of competition in the award of these contracts, and he had used this false pretense as a way to manipulate the process and steer and attempt to steer contracts to companies where he was then on the payroll.

g.      COURTNEY further used his ability to manipulate the procurement process, and fraudulently to steer contracts to companies of his choosing, as a way to burnish his legitimacy and validate the existence of the supposed classified program in the eyes of his actual and intended victims.

### COURTNEY Uses Fund Fraudulently Obtained From One Victim to Partially Repay Another Victim

52.      It was a further part of the scheme that COURTNEY used funds he fraudulently obtained from one victim to partially repay another victim of the scheme, thereby falsely legitimizing himself in the eyes of the victim that received the funds.  More specifically:

a.      As the scheme unfolded, Company A repeatedly pressed COURTNEY for payment for the work that it had performed, and the costs it had incurred, working on the supposed classified program.

b.      COURTNEY thereafter approached Company M, an investment financing company, and falsely claimed that: (i) the United States government, including the United States Marshals Service, was about to seize Company A and all of its assets due to alleged legal violations by Company A's president; (ii) the United States government then owed approximately $1.95 million to Company A for work that that company had performed under the supposedly classified program; (iii) the final seizure of Company A could not take place until the outstanding bill for $1.95 million had been repaid to Company A; (iv) if Company M repaid the outstanding bill to Company A, the United States government would seize Company A, and shortly thereafter repay Company M approximately $2.5 million.  Based on these false pretenses

and representations, Company M agreed to disburse approximately $1.95 million to an account at COURTNEY's direction.

        c.      Once COURTNEY had fraudulently convinced Company M to part with approximately $1.95 million, he caused Company M to transfer that money into an escrow account maintained by an attorney with offices in Tyson's Corner, Virginia.

        d.      COURTNEY then directed the attorney to forward these funds on to Company A, thereby refunding Company A for part of the expenses it had incurred in working on the supposedly classified program. COURTNEY falsely claimed and implied to Company A that these funds had come from the United States government. In so doing, COURTNEY falsely legitimized himself and the existence of the bogus classified program in the eyes of the executives of Company A.

### Execution

53.      On or about October 7, 2015, for the purpose of executing the above-described scheme, in the Eastern District of Virginia and elsewhere, GARRISON KENNETH COURTNEY, also known as "Garrison Kenneth Pierson Courtney," "Glenn Nelson," "Glenn Nielson," "Gary Pierson," and "Garrison Pierson," defendant herein, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, any writings, signs, signals, and pictures, namely, an email, sent at the direction of COURTNEY, from Public Official E addressed to an executive of Company D, with a subject line of "FW: Pending Award (UNCLASSIFIED)," from a computer in the Eastern District of Virginia to a computer outside of Virginia.

54.    COURTNEY further agrees that as a result of the commission of the above-described fraudulent scheme, he directly and proximately caused actual losses to the following victims in the following amounts:

| Victim | Restitution Amount |
|---|---|
| Company B | $108,500 |
| Company C | $352,291 |
| Company D | $348,307 |
| Company E | $314,826 |
| Company F (or its successor-in-interest) | $203,422 |
| Company G | $226,545 |
| Company H | $37,500 |
| Company I | $265,373 |
| Company J | $341,998 |
| Company K | $154,777 |
| Company L | $194,828 |
| Company M | $1,933,500 |
|  |  |
| **Total:** | **$4,481,871** |

## CONCLUSION

55.    This statement of facts includes those facts necessary to support the plea agreement between COURTNEY and the United States. It does not include each and every fact known to COURTNEY or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's cases.

56.    The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

20

G. Zachary Terwilliger
United States Attorney

By: _____

Matthew Burke
Heidi Boutros Gesch
Raj Parekh
Assistant United States Attorneys
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981

Corey R. Amundson
Chief
Public Integrity Section

By: _____

Todd Gee
Deputy Chief
Public Integrity Section
Special Assistant United States Attorney
Eastern District of Virginia

21

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, GARRISON KENNETH COURTNEY, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

GARRISON KENNETH COURTNEY
Defendant

I am Stuart A. Sears, the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Stuart A. Sears, Esquire
Attorney for GARRISON KENNETH COURTNEY

22