IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:20-CR-84 |
| | ) | |
| GARRISON KENNETH COURTNEY, | ) | Judge Liam O'Grady |
|    also known as | ) | |
|      "Garrison Kenneth Pierson Courtney," | ) | |
|      "Glenn Nelson," | ) | |
|      "Glenn Nielson," | ) | |
|      "Gary Pierson," | ) | |
|      "Garrison Pierson," | ) | |
| | ) | |
|    Defendant. | ) | |

**GOVERNMENT'S MOTION TO REVOKE BOND OF**
**DEFENDANT GARRISON KENNETH COURTNEY**

The United States of America, by and through undersigned counsel, hereby respectfully moves this Court to revoke the bond of defendant GARRISON KENNETH COURTNEY and to order that COURTNEY be remanded to the custody of the United States Marshal until sentencing in this matter. In recent weeks, the government has received compelling evidence showing that even after his guilty plea, COURTNEY has persisted in a variation of his fraudulent scheme, by continuing to pose falsely as a government official within the United States intelligence community involved in a supposed classified program. The government therefore respectfully requests that the Court set this matter for an evidentiary hearing at its earliest convenience, at which hearing the government can present evidence showing COURTNEY's ongoing crimes, and the defendant can be given an opportunity to show cause why he should not immediately be detained. In support of its motion, the government states as follows:

1. Since 2015, various law enforcement agencies, including the FBI, the CIA's Office of Inspector General ("CIA OIG"), the Inspector General of the Intelligence Community ("IC IG"), the Defense Criminal Investigative Service ("DCIS"), and others have been conducting an investigation into the suspected fraudulent activities of COURTNEY. That investigation determined, among other things, that beginning no later than 2012, and continuing through at least 2016, COURTNEY orchestrated a massive fraudulent scheme whereby he falsely posed as a covert CIA operative to defraud at least a dozen different companies.

2. On June 11, 2020, COURTNEY pleaded guilty to one count of wire fraud in connection with this fraudulent scheme, pursuant to a written plea agreement with the government. Dkt. Nos. 8, 9, 10, 11. In the written statement of facts signed by COURTNEY and his counsel, and confirmed by COURTNEY under oath in open Court, COURTNEY admitted, among other things, that during the course of the fraudulent scheme, he posed falsely as a covert operative for the CIA, and in that role, approached companies and claimed falsely to be participating in some form of classified "task force" involving various components of the United States Intelligence Community and the Department of Defense. COURTNEY admitted that during the scheme, he claimed falsely that this supposed "task force" sought to enhance the intelligence gathering capabilities of the United States government, when in fact, no such task force existed, and COURTNEY had never been employed by the CIA.

3. COURTNEY further admitted that he had fraudulently advised various companies that the companies needed to hire COURTNEY or otherwise place him on the company's payroll to provide "commercial cover," *i.e.*, to mask his supposed affiliation with the CIA. As now admitted, COURTNEY also fraudulently claimed that the companies would be reimbursed in the future for these payments, often through the award of lucrative contracts from the government as

a part of this supposed classified program. COURTNEY further admitted that, in the course of perpetrating this fraud, he falsely claimed that his conduct and the conduct of his victims was classified, and fraudulently convinced others to pose as public officials, including by falsely posing as members of the intelligence community. COURTNEY further admitted that he used fake non-disclosure agreements purporting to forbid his victims, intended victims, and other potential witnesses from speaking about or otherwise revealing information that COURTNEY had claimed was classified, that he passed this off as an attempt to protect supposedly sensitive information, when in truth his intent was to maintain the illusion of the fraud, and to prevent detection of his fraud by victims, witnesses, and law enforcement. The statement of facts signed by COURTNEY further confirms that COURTNEY defrauded or attempted to defraud 13 different private companies in the course of this scheme of over $4.4 million. Those companies are identified in the statement of facts as "Company A" through "Company M." *See* Dkt. No. 11 at 3-5.

4. After accepting COURTNEY's guilty plea, the Court ordered that the defendant be released pending sentencing in this matter, subject to a series of conditions, including the admonishment that the defendant "shall not commit any offense in violation of federal, state or local law while on release in this case." Dkt. No. 13 at 1.

5. At the time that COURTNEY negotiated his guilty plea with the government, he was employed by Company N. (Company N is not one of the companies that COURTNEY admitted to defrauding in his signed statement of facts.) Representatives for Company N have advised the government that, while employed at Company N, COURTNEY was going by the false alias "Baer Pierson." After learning of the plea agreement between COURTNEY and the

government, Company N began the process of terminating COURTNEY, who resigned just before he otherwise would have been fired.

6. In recent weeks, the government has learned that in the period leading up to his guilty plea, COURTNEY was attempting to defraud Company N, and that he continued to attempt to orchestrate this fraud even *after* pleading guilty in this matter.

7. A senior executive from Company N has advised that, no later than early 2019, COURTNEY—then going under the false alias of "Baer Pierson"—was claiming fraudulently to members of Company N that he was a "burned Agency asset" whose cover had somehow inadvertently been blown by an FBI investigation. (This is patently false; COURTNEY is not now and never has been an "asset" of or otherwise affiliated with the CIA, Dkt. No. 11 at 1-2, and the only thing that this investigation "burned" was COURTNEY's wholly fraudulent scheme.) As the false story developed over the following months, COURTNEY further claimed to executives from Company N that he somehow was involved with a classified governmental program, and that this program might result in a classified, sole-source contract being awarded to Company N from some agency of the United States intelligence community. This supposed contract allegedly would be awarded through a contracting vehicle administered by the General Services Administration ("GSA").

8. The senior executive from Company N further reports that, in or around November 2019, he/she was contacted by Individual D, a private citizen, so that the executive could be "read in" to this supposedly classified program and sign a document purporting to be a nondisclosure agreement that forbade the executive from speaking about the program. (Individual D is a contractor who worked with COURTNEY at the National Institutes of Health Information Technology Acquisition and Assessment Center ("NITAAC"), a federal agency

COURTNEY used to further his fraudulent schemes as discussed in the Statement of Facts.  *See* Dkt. No. 11 ¶¶ 2, 51.  Individual D refused to be interviewed by investigators during the course of the government's investigation of COURTNEY's fraudulent activities.)  Unsurprisingly, the supposed classified, sole source contract from the United States intelligence community never materialized.

9. After the plea papers became public in this case on June 11, 2020, the senior executive from Company N learned the details of COURTNEY's fraud, reached out to an official at GSA to express his/her deep concern, and demanded to know whether and how the GSA official had confirmed the legitimacy of the supposed classified program.  In response, on or about June 19, 2020, the senior executive from Company N received a telephone call from Individual D.  The senior executive from Company N demanded that he/she immediately be put in touch with a government official, who could meet with the executive at a Secure Compartmented Information Facility ("SCIF") within a governmental office to confirm the authenticity of the program.  The senior executive further demanded to have several key executives from Company N immediately "read in" to the supposed program so that they could participate in this meeting and evaluate its legitimacy.

10. In response to this demand, on June 20, 2020, an attorney in Company N's legal department received a phone call from a man claiming that his name was "Devon Azzamoria," and claiming that he was a duty or watch officer for the Office of the Director of National Intelligence ("ODNI").  Phone logs show that the person claiming to be "Devon Azzamoria" was calling from 202-935-0058.  The person claiming to be "Devon Azzamoria" said that he was calling to arrange to have members of Company N "read in" to a supposed classified program.  This man further directed Company N's in-house counsel that the counsel should call 202-935-

0058, which supposedly was a phone number for the ODNI's duty station or duty officer, and provide the identities of the persons from Company N who should be "read in" to the supposed classified program. During the course of this call, the man claiming to be "Devon Azzamoria" further claimed that the senior executive from Company N had signed a non-disclosure agreement with the CIA, and that the in-house counsel should remind that senior executive that he/she could not speak at all about the supposed classified program. During a later telephone call over 202-935-0058, the man claiming to be "Devon Azzamoria" further represented that he was working to arrange the requested "read in," and explained that the meeting supposedly would happen "in McLean." ("McLean" is a common euphemism for CIA headquarters.)

11. The government's investigation indicates that COURTNEY was the man falsely posing as "Devon Azzamoria" during these fraudulent telephone calls. An investigator with the IC IG, which has oversight of ODNI, has confirmed that 202-935-0058 is not associated with the ODNI's watch office. The investigator with IC IG further has contacted the ODNI's watch office, which has confirmed that no one by the name of "Devon Azzamoria" works there. The IC IG investigator further searched for the name of "Devon Azzamoria" and similar names in several internal databases, and found no record of anyone by that or similar names working at ODNI.

12. Talktone, Inc. is a company that provides voice-over-internet-protocol ("VOIP") services. VOIP services enable a user to place and receive telephone calls using the infrastructure of the internet, rather than the traditional telephone network. Records from Talktone, Inc. show that, on June 20, 2020, telephone number 202-935-0058 was accessed via the internet protocol ("IP") address 47.198.10.58. Records from Frontier Communications, Inc., an internet service provider, further show that as of June 20, 2020, the IP address 47.198.10.58

was assigned to customer "Garrison Piersoncourtney," [sic] at COURTNEY's home address in Florida.

13. During the course of the pre-plea criminal investigation of Courtney, law enforcement had identified telephone number (703) XXX-5140 as a cellular telephone number used by COURTNEY. When COURTNEY was booked following his guilty plea on June 11, 2020, he confirmed that this was still his phone number. Records from AT&T show that on June 20, 2020, the number falsely represented as the ODNI duty line, (202) 935-0058, placed two calls to COURTNEY's cellphone, (703) XXX-5140. AT&T's records appear to show that both calls were disconnected before the call went through.

14. COURTNEY's brazen actions in continuing to perpetrate his fraud, even after pleading guilty and being admonished by this Court, show that there are no conditions short of detention that can protect the community pending sentencing. Subject to exceptions not relevant here, the Bail Reform Act provides:

> the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to 28 U.S.C. 994 does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c).

18 U.S.C. § 3143(a)(1). Pending sentencing, "[t]he burden of establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant." Fed. R. Crim. P. 46(c). *See also United States v. Sy*, 2017 WL 3537399, at *1 (E.D. Va. Aug. 17, 2017) (Cacheris, J.) (quoting *Gov't of Virgin Islands v. Clark*, 763 F. Supp. 1321, 1323 (D.V.I. 1991)) ("After conviction, '[t]he presumption is in favor of detention, and it is the defendant's

7

burden to prove by clear and convincing evidence that he is not likely to flee or pose a danger to the community.'").

15. The defendant cannot meet his burden of showing that he does not pose a danger to the community here. Even after this Court explicitly ordered the defendant not to commit any further crimes, despite his public admission that he has never been affiliated with the CIA, and notwithstanding the considerable attention in the press to the defendant's crimes, COURTNEY persists in attempting to orchestrate the fraud. He has done so while subject to a series of restrictive bond conditions, *see* Dkt. No. 13, and substantial public scrutiny. None of that succeeded in preventing his ongoing criminal conduct; detention is therefore the only reasonable option for protecting the public from this defendant.

WHEREFORE, the government respectfully requests that this Court set the matter for an evidentiary hearing at its earliest convenience, at which hearing the government can present the evidence proving the defendant's ongoing fraud, and the defendant can be given an opportunity to show cause why he should not immediately be remanded to the custody of the United States Marshal.

Respectfully Submitted,

| | |
|---|---|
| G. Zachary Terwilliger<br>United States Attorney | Corey R. Amundson<br>Chief<br>Public Integrity Section |

By:     /s/
    Matthew Burke
    Heidi Boutros Gesch
    Raj Parekh
    Assistant United States Attorneys
    United States Attorney's Office
    2100 Jamieson Ave
    Alexandria, VA
    Phone: 703-299-3700
    Fax: 703-299-3981

By:     /s/
    Todd Gee
    Deputy Chief
    Public Integrity Section
    Special Assistant United States Attorney
    Eastern District of Virginia

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of August, 2020, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

A copy also will be sent via email to:

>Vakida Wilson
>United States Probation Officer
>Vakida_Wilson@vaep.uscourts.gov

/s/
Matthew Burke
Assistant United States Attorney