**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:20CR00084** |
| | ) | |
| **GARRISON KENNETH COURTNEY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S POSITION ON SENTENCING**

On October 23, 2020, defendant Garrison Kenneth Courtney will appear before this Court to be sentenced for the offense of wire fraud. He will enter the court from the door of a holding cell in the back of the room. Though many of his victims may fill the courtroom, he will not have any supporters. In the lead up to his sentencing, Mr. Courtney, *as a result solely of his own conduct*, has lost everything he had. His wife divorced him. He lost custody of his children. He has now lost most of his friends. He has no assets and has lost whatever may have been left of his reputation.

Mr. Courtney faces a long and difficult road to repairing his life, career and relationships. But before he can even begin that overwhelming process, he must first complete the sentence of this Court. Mr. Courtney understands that this Court is required to impose a sentence that is sufficient, but not greater than necessary, to advance the purposes of federal sentencing. 18 U.S.C. § 3553(a). As the Presentence Investigation Report ("PSR") reflects, Mr. Courtney is 44 years old and has no prior criminal history. As will be detailed below, Mr. Courtney has served his country and government through his military service and employment. We respectfully submit, that in light of the following arguments, and the sentences recently imposed in comparative cases, that a

1

sentence of 37 months of incarceration is sufficient, but not greater than necessary, to achieve the goals of the § 3553(a)'s sentencing factors.

## I.      THE PLEA AGREEMENT AND SENTENCING GUIDELINES

Mr. Courtney pled guilty on June 11, 2020 to a one-count Information charging him with committing wire fraud (18 U.S.C. § 1343).  The maximum punishment for his offense is 20 years imprisonment, a $250,000 fine or twice the gross gain or loss, full restitution, a $100 special assessment, and three years of supervised release.  Under the terms of the written plea agreement (Dkt. 10), Mr. Courtney and the government agreed to recommend the application of the following United States Sentencing Guidelines ("U.S.S.G." of "Guidelines") provisions:

- A base offense level of 7, pursuant to U.S.S.G. §2B1.1.

- An 18-level increase based on the total loss amount of $4,481,871, pursuant to U.S.S.G. §2B1.1(b)(1)(J).

- A 2-level increase because the offense involved more than 10 victims, pursuant to U.S.S.G. §2B1.1(b)(2)(A).

- A 2-level increase because the offense involved the misrepresentation that Mr. Courtney was acting on behalf of a government agency, pursuant to U.S.S.G. §2B1.1(b)(9).

In addition to the above joint Guidelines recommendations, the United States further agreed that it would not seek:

- A 2-level increase for the use of sophisticated means in carrying out the fraud scheme, pursuant to U.S.S.G. §2B1.1(b)(10).

- A 2-level increase for obstructing or impeding the administration of justice, pursuant to U.S.S.G. §3C1.1.

2

Finally, as to the plea agreement, the United States agreed that "[I]f the defendant qualifies for a two-level decrease in offense level pursuant to USSG §3E1.1(a) and the offense level prior to the operation of that section is a level 16 or greater, the government agrees to" move for "an additional one-level decrease in the defendant's offense level." Dkt. 10 at 4.  Thus, a Guidelines calculation consistent with the recommendations and agreements contained in the plea agreement, results in a total offense level of 26, with a corresponding advisory range of 63-78 months of imprisonment.

The PSR has calculated a very different Guidelines range.  First, the PSR recommends the imposition of a 2-level increase for obstruction of justice.  *See* PSR ¶119.  The basis for the proposed enhancement is Mr. Courtney's contact with an employee at his former employer, Company N, shortly after he entered his guilty plea before this Court.  Mr. Courtney disguised his identity and assumed a false persona for the purpose of advising the employee that arrangements were being made to "read on" Company N employees into a classified program and to remind another Company N executive that he had previously signed a non-disclosure agreement related to the program.  *See* PSR ¶¶87-98.

Second, as a result of the imposition of the obstruction enhancement, the PSR recommends that Mr. Courtney should not receive any reduction in his total offense level for having accepted responsibility for his offense conduct.  *See* PSR ¶122.

Third, the PSR recommends imposition of the 2-level enhancement for sophisticated means, which the government had agreed not to seek.

Together, the PSR's recommendations increase Mr. Courtney's total offense level from 26 to 33, and his advisory Guidelines range from 63-78 months to 135-168 months.  *See* PSR ¶162.

For the reasons that follow, Mr. Courtney asks this Court to calculate the Guidelines as contemplated in the Plea Agreement.

### a.   The Obstruction of Justice Enhancement Should Not Be Applied

Mr. Courtney concedes that his brief conduct shortly after his guilty plea, as described in the PSR (¶¶87-98), was wrong.  As evidenced by his consent to the revocation of his bond, he acknowledged that there needed to be consequences for his actions.  But although his conduct was unacceptable, it does not rise to the level necessary to warrant imposition of a 2-level enhancement for obstruction of justice.

First, Mr. Courtney had to have acted with the specific intent to obstruct or impede *the government's investigation* when he contacted the Company N employee.  *See* U.S.S.G. §3C1.1 (restricting the enhancement to situations where the defendant "*willfully* obstructed or impeded, or attempted to obstruct or impeded" justice) (emphasis added); *see also United States v. Zagari*, 111 F.3d 307, 328 (2d Cir. 1997) ("The willfulness requirement means that the enhancement 'is appropriate only upon a finding that the defendant had the '*specific intent to obstruct justice*, i.e., that the defendant *consciously acted with the purpose of obstructing justice*.'") (quoting *United States v. Defeo,* 36 F.3d 272, 276 (2d Cir.1994)) (emphasis added).

Significantly, Mr. Courtney had no reason to believe, at the time of his June 11, 2020 plea hearing, and the following week, that the government was still investigating his conduct.  To the contrary, from Mr. Courtney's perspective, the government's investigation had concluded by at least the date on which he signed the plea paperwork – March 26, 2020 – if not sooner.  By that date, the government had been investigating Mr. Courtney for several years and Company N had been aware of the government's investigation because, upon information and belief, it received a grand jury subpoena related to the investigation in or about 2016.

Moreover, the government made clear to Mr. Courtney and his counsel that employees at Company N were cooperating with the government's investigation and had even informed the government that he was using the Baer Pierson alias.[1]  The government stated as much directly to Mr. Courtney and his counsel during a reverse proffer on December 20, 2019.  In addition, Mr. Courtney had previously agreed to be bound by certain conditions between the time he signed the plea agreement in March 2020 and when it was finally entered before this Court in June 2020. That agreement allowed the government to speak with his employer and share the details of his agreement and the statement of facts, even though neither document had been filed publicly and the Court had not yet accepted his plea agreement.[2]  Therefore, Mr. Courtney had every reason to believe that the government was fully aware of the employee's claims by at least December 2019.

Second, Mr. Courtney's conduct did not obstruct justice and did not impede any investigation. At most, and at the time of Mr. Courtney's June phone calls and text messages, the evidence shows that the Company N executive was carrying out his own personal inquiry into his

---

[1] It should also be noted that, while Mr. Courtney did use the Baer Pierson alias for a period of time at Company N, his legal name was known to his peers and company leadership. Mr. Courtney previously provided the probation office with a copy of his W-2, which Company N issued in his full name. In any event, that conduct alone is not fraudulent and, even if it were, it occurred prior to his guilty plea.

[2] A copy of the "Agreement Regarding Conditions Prior to the Formal Entry of Guilty Plea" is attached as Exhibit 1.  Mr. Courtney agreed, in Section 2 of the Agreement, that the government's notice to Company N "may include the United States describing, summarizing the substance of, and orally reading portions of the plea agreement and statement of facts…."  And the government did speak with Company N's leadership or outside counsel to make them aware of the guilty plea and to describe the conduct for which Mr. Courtney had admitted guilt.  Mr. Courtney was aware that conversation had occurred because Company N's outside counsel contacted undersigned counsel directly to confirm the government's representations.

own interactions with Mr. Courtney and Individual D, and was not acting on behalf of the government.[3]

Third, other than the brief series of calls and texts that occurred over two days in June 2020, there is no evidence Mr. Courtney took any other act, or made any other effort, to follow up on the calls and text messages between June and August 2020. The lack of any follow-up supports the conclusion that Mr. Courtney was not attempting to impede the government's investigation or to complete another fraud scheme.

The motivation for Mr. Courtney's conduct in the days following his plea hearing was not to obstruct the government's investigation, which had concluded, and not to stop a victim from coming forward, because Company N was not a victim, and not to deceive his friend, Individual D.  Rather, it was a foolish attempt to satisfy the executive's personal inquiry so that it would not raise additional questions about Individual D's involvement or harm his reputation and business. As stated previously, Mr. Courtney had no reason to believe that the government was not aware of his interactions with Company N's executive, and his only goal was to create the impression that what Individual D had been involved with was legitimate.  It was not because of the government's investigation or because he was worried about another victim coming forward.

On a related note, the PSR suggests that Mr. Courtney may have engaged in the June 2020 conduct in an effort to defraud Individual D into giving him a job through the promise of future contracts.  *See* PSR ¶98.  That claim is not supported by the facts.  Indeed, undersigned counsel can confirm that Mr. Courtney had been offered an opportunity to work at Individual D's company at or about the time he signed the plea paperwork in March 2020.  After Company N was made

---

[3] Upon information and belief, there was no indication that the executive was going to notify the government if it turned out that there was in fact no potential for a classified contract.

aware of the plea agreement, Mr. Courtney was placed on unpaid administrative leave. As a result, Mr. Courtney needed to find new employment and it was at that time that Individual D offered Mr. Courtney a job. Undersigned counsel was a part of those discussions with Mr. Courtney as they were occurring.[4] Mr. Courtney ultimately declined Individual D's offer because he was concerned about how the government would view Individual D if he hired Mr. Courtney. It was not until August 2020 – almost five months after Mr. Courtney first signed the plea agreement and almost two months after his June 2020 contacts with the Company N executive – that Mr. Courtney decided to accept Individual D's offer.[5]  And Mr. Courtney's motivation for accepting the offer in August, as opposed to earlier, was that his shifts at Pizza Hut were inconsistent and limited his ability to earn enough money to meet his child support obligations.

For the foregoing reasons, and in the absence of proof that Mr. Courtney acted with the specific intent to obstruct justice, it cannot be established that Mr. Courtney "*willfully* obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction…." U.S.S.G. §3C1.1 (emphasis added). Therefore, the Court should not impose a 2-level enhancement for obstruction of justice.

### b.  The Court Should Find that Mr. Courtney has Accepted Responsibility

If the Court rules in Mr. Courtney's favor with regard to the obstruction of justice enhancement, it should award him a 2-level reduction for acceptance of responsibility. Even if the

---

[4] Significantly, those discussions occurred months before Company N's June inquiry in to the "program," which no one could have anticipated and which was the sole impetus for what transpired afterwards.

[5] It should be noted that Mr. Courtney submitted the employment paperwork through Pretrial Services for approval and did not attempt to conceal his planned work for Individual D.

Court finds that the obstruction of justice enhancement is appropriate, Mr. Courtney asks this Court to still grant him the 2-level reduction. Mr. Courtney's actions following his plea do not establish that he has not accepted responsibility for his offenses. To the contrary, Mr. Courtney has clearly demonstrated his acceptance through his timely guilty plea, his agreement to be bound by the terms he reached with the government even prior to the entry of his guilty plea, and his compliance with all other terms of release. His brief actions following his guilty plea warranted his incarceration pending sentencing but we submit do not call into question his complete acceptance of responsibility for all that he has done.

     **c.  The Court Should Give Considerable Weight to the Government's Agreement Not to Seek the Sophisticated Means Enhancement**

As noted in the PSR, Mr. Courtney agrees that his scheme involved the use of sophisticated means. *See* PSR at 39. He also understands that this Court has an obligation to calculate the Guidelines independently and correctly, regardless of any non-binding recommendations or agreements by the parties. Mr. Courtney also knew, at the time he entered his plea agreement, that the PSR and Court would likely apply the sophisticated means enhancement. Nevertheless, the government's agreement not to seek the enhancement[6] was an important concession to Mr. Courtney and the Court's willingness to give substantial weight to that agreement when imposing sentence, will encourage the government and defendants that courts will attach significance to their negotiations and agreements. These types of concessions, even when non-binding, often help resolve cases in a manner that conserves government and judicial resources. For that reason, Mr. Courtney asks this Court to give strong consideration to the parties' joint recommendations and

---

[6] To be clear, the government agreed to not seek the enhancement but did not agree that it was inapplicable or that it would oppose its application if recommended by the probation office.

agreement as an added reason to vary from its calculated Guidelines' range, in addition to the 18 U.S.C. § 3553(a) sentencing factors.

## II.    THE 18 U.S.C. § 3553(a) SENTENCING FACTORS SUPPORT A VARIANCE FROM THE RECOMMENDED GUIDELINES SENTENCE

Section 3553(a) requires district courts to consider the following factors in imposing sentence:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s).  18 U.S.C. § 3553(a)(1)-(7).  The end result of the analysis must be a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing, i.e., the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  For the reasons that follow, a sentence of 37 months is "sufficient, but not greater than necessary" to serve the purposes of federal sentencing under the circumstances of this case.

### a.  Mr. Courtney's Personal History and Characteristics

Mr. Courtney is a 44-year-old first-time felon with no criminal history.  As is detailed in the PSR, Mr. Courtney was born on a U.S. military base in the Philippines while his father was serving in the Air Force.  When he was approximately 4 years old, and after the family had returned to the United States, Mr. Courtney's mother abruptly left him and his 5-year-old brother alone at their home and never returned.  Although Mr. Courtney had some limited contact with his mom over the following year, he has not seen her in close to 40 years.

Shortly after his parents' divorce, Mr. Courtney's father remarried, and he and his wife remained together until his father's death in 2012.  As a result of his father's frequent travel, Mr. Courtney was primarily raised by his stepmother.  He and his step-mother have a good relationship and maintain regular contact.  In addition to his older brother, Mr. Courtney has three step-siblings from his father's second marriage.  As noted in the PSR, Mr. Courtney does not have a close relationship with his stepsiblings.

In many respects, Mr. Courtney's life prior to his offense conduct is commendable.  He experienced the trauma of being abandoned by his mother at a very young age and at a time when he had limited interaction with his father.  A week after his 17th birthday, Mr. Courtney enlisted in the Army National Guard of Montana, where he served as a combat engineer. During his time with the National Guard, Mr. Courtney was awarded the Campaign Ribbon for his efforts in helping combat the widespread forest fires that plagued Montana in 1994.  In February 1995, Mr. Courtney went on active duty with the U.S. Army.  Although not referenced in the PSR, Mr. Courtney was awarded the Army Achievement Medal, the National Defense Service Medal, and the Army Service Ribbon during his service in the Army.  Mr. Courtney received an honorable medical discharge in 1996, due to lung damage sustained while battling the 1994 fires.

It does not appear that Mr. Courtney had very much financial support but with the assistance of substantial student loans, he was able to obtain a Bachelor degree and a Master of Public Policy.   Moreover, Mr. Courtney appears to have always exhibited a strong work ethic. *See* Exhibit 2[7] (Letter from Jesse Lohse) ("While at [The University of Montana] I roomed with Garrison where I saw firsthand his tireless work ethic working multiple jobs to put himself through school including hosting an early morning radio show that had him out of the house daily at

---

[7] All of the letters submitted on Mr. Courtney's behalf have been consolidated in Exhibit 2.

5AM."). Indeed, he had become a GS-15 level federal employee by the time he had turned 30 and served both the DEA and INS/ICE in senior communications roles. Among the records shared with the probation office are numerous documents from both the DEA and ICE detailing promotions and performance-based cash awards. The vast majority of Mr. Courtney's professional history demonstrates that, when put to good use, his skills and attributes have made a positive and well-recognized impact on his employers. Mr. Courtney is personable, smart and a hard-worker. He is fully capable of rebounding from his conviction and earning an honest living.

But there can be no dispute that Mr. Courtney clearly fell off the path he had been on. It is obvious from the PSR that Mr. Courtney had significant financial problems at the time of his offense conduct. And although Mr. Courtney made a considerable sum of money during the course of his offenses, he was also single-handedly supporting a family of five, in addition to trying to keep up with his child support obligations and a series of debts Mr. Courtney had acquired over the years, including student loans, credit card bills, and medical bills. Indeed, Mr. Courtney filed for bankruptcy in 2014 and as the Court can see from the PSR, his liabilities substantially outweigh his assets.

While Mr. Courtney's financial pressures help explain why he engaged in the charged fraud scheme, the records demonstrate, and undersigned counsel is not aware of any allegation to the contrary, that Mr. Courtney used his income to support his family and related financial obligations. This does not appear to be a case where the defendant used ill-gotten gains to support a lavish life-style. And while that does not mean his crimes are any less serious or that his victims suffered any less, it is something courts often consider when deciding on an appropriate punishment.

Lastly, as to this factor, this Court should also consider the role Mr. Courtney plays in the life of his children and the extent to which they and his former spouse rely on his ability to earn

11

an income.  As noted in his letter, Mr. Courtney is especially thankful for his five children and

they are his motivation to return to a law-abiding and honorable life.[8]  *See* Exhibit 3 at 3-4 (Letter

from Garrison Courtney) ("I have had many positive experiences in my life, including the honor

to have served my country, earn a graduate degree, and to become a father to five wonderful

children.").   Mr. Courtney's long-time friend, Heather Gable, has written to the Court about Mr.

Courtney's "dedication to fatherhood" and how he "creates an upbeat, happy environment for his

boys" despite the challenges he is facing as a result of his conviction and the dissolution of his

marriage.  *See* Exhibit 2.  Even Mr. Courtney's ex-wife, the mother of his three youngest boys,

told the probation office that "despite everything that has happened, the defendant is a wonderful

and involved father."  *See* PSR ¶ 142.  As she states in her letter, Mr. Courtney's "weekends were

busy coaching local youth sports teams, hosting community events and never once complained

when it was time to step in and be a real parent."  *See* Exhibit 2.  She also noted, as did Ms. Gable,

that the children have noticeably suffered since Mr. Courtney's incarceration.   It is evident that

Mr. Courtney plays an important role for his children, both as a caretaker and as their primary

financial provider. Ms. Pierson writes "I know firsthand what it's like to grow up without both

parents.  All I can hope to ask for is that our boys don't have to endure that reality for a long time."

*Id*.  Mr. Courtney respectfully asks the Court to consider his important contributions to the lives

of his children, and the effect of his absence, as it decides the length of a sentence that is "sufficient,

but not greater than necessary" to achieve the purposes of federal sentencing.

---

[8] Mr. Courtney has one child from his first marriage, who resides in California.  Mr. Courtney has three young boys with his second wife, from whom he is now divorced.  Despite their divorce, Mr. Courtney still considers his second wife's child from a separate relationship as his step-son.

### b.   The Nature and Circumstances of the Offense

The nature and circumstances of Mr. Courtney's offense is recounted in excruciating detail in the 22-page statement of facts that Mr. Courtney signed and admitted as true at the time he entered his guilty plea.  *See* Dkt. 11.  The entire statement of facts is reproduced verbatim in the PSR, along with additional facts surrounding Mr. Courtney's offense and related conduct.  *See* PSR ¶¶ 6-98.  For that reason, and because the government will likely focus a substantial portion of its sentencing memorandum on Mr. Courtney's offense conduct, the nature and circumstances of Mr. Courtney's conduct is only addressed here when it bears on the arguments raised in this memorandum.

But to be clear, Mr. Courtney admits and agrees that the statement of facts is an accurate account of his conduct and that he was not, and never has been, affiliated with the CIA.  The entire story was a ruse to obtain employment by making him appear to be a risk-free hire that not only would be paid for by the government, but also carried the potential for lucrative future contracts. Everything he did was designed to further and preserve that scheme, and although several of his unwitting victims took control of some aspects of the "program," it was only as a direct result of his deception and he never once tried to stop or reign in the scheme that he alone created.

### c.   The Need to Avoid Unwarranted Disparity Among Similar Offenders

In researching cases that might provide some guidance to the Court with respect to disparity considerations, one case in particular stood out.  In *United States v. Wayne Shelby Simmons*, Case No. 1:15-cr-00293-TSE (E.D. Va. 2015), the defendant was charged by indictment with one count of making false statements, two counts of fraud against the United States, and four counts of wire fraud.  "The charges related to the defendant's various attempts at obtaining money from the government, government contractors, and a private individual by means of materially false and

fraudulent statements and representation – most notably, his claim that he was a supposed former long-time agent of the [CIA]." *See* Dkt. 118 at 3 (Position of the United States with Respect to Sentencing). Simmons litigated his case extensively pretrial, including a series of CIPA hearings where he claimed to have evidence supporting his affiliation with the CIA. Ultimately, and begrudgingly, he entered into a plea agreement with the government. Nevertheless, and despite having admitted in his statement of facts that there were no records or evidence that he had ever worked with or for the CIA, he maintained throughout the proceedings, including through sentencing and beyond, that he had worked for the CIA for 27 years as an "Outside Paramilitary Special Operations Officer." *Id*. at 4.

Like Mr. Courtney, Simmons successfully used his false backstory to obtain employment and other financial benefits. In one example, an IRS employee taken with Simmons' stories directed a subordinate to lower his $1.1 million tax bill by approximately $430,000. *Id*. at 24. In another example, Simmons used contacts he had made while serving as a commentator on Fox news (another job earned through false credentials), to obtain a job with BAE Systems where he even "trained at Fort Leavenworth to be deployed to Afghanistan as a Human Terrain Systems team leader." *Id*. at 26. During the application process, he not only lied about his work history with the CIA but also provided false statements about his criminal history (prior felony assault, DUIs, and possession of a firearm by a felon) and the holding of previous security clearances. *Id*. Fortunately, Simmons performed so poorly during training that he never deployed and was asked to resign. *Id*.

Undeterred, Simmons thereafter obtained a job with Drop Test International "as a senior intelligence advisor on the International Security Assistance Force's Counterinsurgency Advisory and Assistance Team (CAAT) in Afghanistan." *Id*. at 29. His résumé detailed his "27 years in the

CIA," and contained numerous lies about his involvement in various "operations" as well as his duties at prior jobs, which he in fact never held. *Id*. Despite additional lies about his employment and criminal history (including a felon in possession conviction), Simmons somehow received an interim clearance and was *actually deployed to Afghanistan with authorization to be furnished with a firearm*. His interim clearance was subsequently revoked and he was returned to the United States. As the government put it:

> The defendant had no military or intelligence background, or any skills relevant to the positions he attained through his frauds. He was a criminal and a con man, and he was on the verge of being in a position to give critical intelligence advice to real military and intelligence actors in a war zone. It is no exaggeration to say that had the defendant's fraud progressed only a small step further, his actions or advice might have led to the tragic death of U.S. service members.

*Id*. at 44.

But there is more. Simmons also tricked a close friend into taking out a $125,000 home equity line of credit so he could put it towards a "real estate investment." *Id*. at 31. In truth, there was no investment and Simmons spent nearly all of the friend's money. He also attempted to defraud Chase bank into not foreclosing on his home by advising the bank that his work for the U.S. government had been terminated as a result of Chase's failure to modify his mortgage. *Id*. 32-33. Simmons even used his fake CIA story in an attempt to have his deceased wife's remains inured at Arlington National Cemetery. *Id*. at 33. The cemetery ultimately denied his request, even though former Defense Secretary Donald Rumsfeld, and a retired Major, both wrote letters on his behalf. *Id*. In addition, Simmons used his false credentials and backstory to obtain a position on a commission investigating the 2012 attacks against U.S. government facilities in Benghazi, Libya. *Id*. at 34.

To top it all off, Simmons took steps to obstruct the government's investigation at various stages and even after his arrest. He lied to the FBI during a voluntary interview and in written

correspondence afterwards.  *Id*. 24-25.  He also contacted multiple potential victims in an attempt to improperly influence their interviews with the FBI.  *Id*. at 35-36.  Most troubling, however, was Simmons' attempts to avoid potential firearms charges. As noted above, Simmons had prior convictions for a felony assault offense and two counts of being a felon in possession.  *Id*. at 36. But at the time of his arrest in 2015, law enforcement recovered two firearms from his home. While in custody, Simmons made more than one attempt, over a recorded telephone line, to convince his own son to lie to agents by claiming that the guns belonged to him, and not Simmons. *Id*. at 35-41.

By the time Simmons' case reached sentencing, his Presentence Report recommended a two-level increase for obstruction of justice and the denial of any reduction for acceptance of responsibility, apparently based on the fact that Simmons refused to disavow his connection to the CIA during the PSR interview and maintained that he had proof of his CIA employment.[9]  *Id*. at 42.  Despite a criminal history that included "a dozen alcohol-related arrests, state gambling and firearms convictions, and federal firearms convictions," Simmons fell into Criminal History Category II.  *Id*. at 46.  The PSR calculated a total offense level 20 (37-46 months), which included a base offense level of 14 on the firearms offense.  The government, on the other hand, had agreed to recommend a base offense level of 12.  Thus, the government recommended a total offense level of 18, with a corresponding advisory range of 30-37 months.  The government asked for a sentence

---

[9] It should be noted as the Court considers Mr. Courtney's objections to the PSR that neither the probation office, the government or even the Court based its analysis over whether Simmons should receive a reduction for acceptance of responsibility on any fact other than his continued insistence that he had been affiliated with the CIA.  No party argued that he should lose acceptance based on his obstruction of justice related to the FBI interviews, or his tampering with witnesses, or his phone calls with his son. And the Court grounded its ruling denying credit for acceptance of responsibility only on its finding that Simmons "clearly did not truthfully admit the conduct compromising the offense of conviction."  *See* July 15, 2016 Sent. Tr. at 24 (Dkt. 129).

of 37 months and Simmons requested probation.  The Court ultimately adopted the calculations contained in the PSR and the corresponding 37-46-month Guidelines range. After balancing all of the § 3553(a) sentencing factors, the Court imposed a sentence of 33 months, which was within the range recommended by the government.

While Mr. Courtney and Simmons engaged in similar conduct, there are material differences between their cases that the Court should consider.  Admittedly, Mr. Courtney's conduct resulted in greater financial loss and appears to have involved more victims.  Those are fair distinctions and Mr. Courtney does not argue to the contrary.  On the other hand, however, while Simmons' conduct may not have generated such large loss amounts, his conduct was far more dangerous.  As the government repeated in its sentencing memo and at the sentencing hearing, Simmons' fraud, had it been more successful, would have put American lives at risk.[10] And even though it failed, he caused delays and otherwise impaired the government's efforts in a foreign conflict.  *See id.* at 45 ("As Colonel Felter explained, the situation with the defendant 'definitely had a negative operational impact' on CAAT's operations because it resulted in a vital position remaining vacant for an extended period of time after the defendant's removal.").

Moreover, unlike Simmons, Mr. Courtney has no prior criminal convictions or arrests. Simmons had almost no record of serious employment and, other than a week-long stint in the Navy, had never served his country in any capacity.  Mr. Courtney has a long history of significant and honest employment with two federal agencies, and has served his country in the Army and the National Guard.

---

[10] *See* Dkt. 118 at 44 ("As General McChrystal explained, the CAAT was responsible for teaching U.S. and Afghan forces how to conduct counterinsurgency operations and to assess whether forward deployed units were implementing those operations correctly; the job was 'hugely important' to the war effort.").

Lastly, whatever the Court may decide about the impact of Mr. Courtney's post-plea conduct on his Guidelines and sentence, Simmons' post-arrest conduct was far more egregious. Not only did Simmons contact a potential witness, his son, but affirmatively attempted to convince him to lie to the FBI. Equally important, Simmons clung to his CIA story until the very end, including at sentencing (and afterwards when he pursued an ineffective assistance of counsel claim against his counsel). Since the signing of his plea paperwork in March, and the entry of his guilty plea in June, Mr. Courtney has made no claim of innocence and has fully admitted, at every single stage, that he has never been affiliated with the CIA.

For all these reasons, Mr. Courtney submits that the *Simmons* case is a good benchmark for considering sentencing disparity in his case. And while there is no shortage of fraud cases from which either party could find sentences that align with their request, Mr. Courtney makes quick reference to two recent cases that suggest that a Guidelines sentence, whatever that Guideline may ultimately be, is greater than necessary to accomplish the purposes of federal sentencing in this case.

In *United States v. Joseph Edward Gargan*, Case No. 1:20-cr-00110-RDA (E.D. Va. 2020), the defendant pled guilty to a two-count criminal information charging him with embezzlement of government funds and wire fraud. With regard to the first count, Gargan admitted to embezzling $7,957,750 from several settlement accounts "in which the money was intended to compensate and support 13 individuals, including seven children and six adults," who were injured through medical negligence.[11] *See* Dkt. 26 at 3 (Position of the United States with Respect to Sentencing).

---

[11] It appears from the pleadings that the annuities themselves were backed by the federal government. Therefore, although Gargan misappropriated the funds, the government ensured that the annuities were funded.

"Instead of using the money to purchase annuities as he was hired to do, Mr. Gargan used the settlement funds for his personal benefit, including to support a lavish lifestyle." *Id*. at 1.  With regard to the second count, Gargan embezzled $1,032,750 from an annuity created "to ensure the long-term care of a severely disabled child." *Id*. at 4.  The defendant fell into Criminal History Category II as a result of a misdemeanor conviction for brandishing a firearm, and his Guidelines calculation resulted in a total offense level of 26 (70-87 months).  The court imposed a sentence of 70 months.

In *United States v. Paul J. Manafort, Jr.*, Case No. 1:18-cr-00083-TSE (E.D. Va. 2019), a case which needs little introduction, a jury convicted the defendant on eight counts related to the filing of false tax returns, failing to report foreign bank accounts, and bank fraud.  While the jury ultimately hung on ten counts, Manafort subsequently admitted his guilt for the conduct underlying those charges when he later pled guilty to related charges in U.S. District Court for the District of Columbia.  *United States v. Paul J. Manafort, Jr. et* al, Case No. 1:17-cr-00201-ABJ (D.D.C. 2019).  According to the Special Counsel's Office, "Manafort's misconduct involved more than $16 million in unreported income resulting in more than $6 million in federal taxes owed, more than $55 million hidden in foreign bank accounts, and more than $25 million secured from financial institutions through lies resulting in a fraud loss of more than $6 million." *See* E.D. Va. Dkt. 314 at 2 (The Government's Sentencing Memorandum).  While on pretrial release pending trial in both districts, Manafort and his associate, who would also later be indicted, repeatedly contacted potential witnesses "in an effort to secure materially false testimony…." *See* D.D.C. Dkt. 315 at 5 (Government's Motion to Revoke or Revise Defendant Paul J. Manafort, Jr.'s Current Order of Pretrial Release).  As a result, Manafort's bond was revoked in the District of Columbia and he later pled guilty in D.C. to obstruction of justice and fraud charges.

Manafort faced an advisory Guidelines range of 235 to 293 months in the Alexandria case and 188 to 235 months in the D.C. case. He was sentenced first in Alexandria, and the court imposed a sentence of 47 months. Shortly thereafter he received a concurrent sentence of 60 months[12] for the D.C. convictions. In all, Manafort was sentenced to serve a total of 60 months for both cases.

While these cases present substantially different conduct than that found in Mr. Courtney's case, we submit that they are relevant to this Court's sentencing analysis. The *Gargan* case, for example, represents a recent case with an arguably more egregious fraud and an indisputably higher loss amount (approximately double), where the defendant received a sentence of 70 months. The Manafort case is another recent example of a case with a significantly higher loss amount than that found here, but also one where the defendant went to trial (in one jurisdiction), and obstructed justice by attempting to influence the testimony of material witnesses, which resulted in the revocation of his bond. The defendant's Guidelines were *substantially* higher than Mr. Courtney's in both jurisdictions, even if this Court adopts the PSR's recommendation, and nevertheless, the defendant received a total sentence of 60 months.

While Mr. Courtney has committed serious crimes, and did so in a rather sophisticated and remarkable way, a compelling case can be made that, on balance, he deserves a punishment similar to that imposed in *Simmons*, and less than that imposed in *Gargan* and *Manafort*.

### d. Purpose of Federal Sentencing

As noted earlier, Congress has identified four purposes of federal sentencing that must guide district courts in selecting a sentence. 18 U.S.C. § 3553(a)(2)(A)-(D). The first purpose of

---

[12] Both counts of conviction in D.C. carried a maxim term of imprisonment of 60 months. However, the Court could have ordered the sentences on both counts to run concurrently with each other, and could have ordered the D.C. sentences to run consecutively to the Alexandria sentences.

federal sentencing is "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The second purpose is "to afford adequate deterrence to criminal conduct." The third purpose is "to protect the public from further crimes of the defendant." And the fourth purpose is "to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner." The Court must then impose a sentence "sufficient, but not greater than necessary," to achieve those goals.

We respectfully submit that the purposes of federal sentencing would be fully served by imposition of the sentence recommended in this memorandum. A sentence of 37 months will separate Mr. Courtney from the public for a significant period of time and will ensure that he pays a meaningful price for his offense. Moreover, the widespread media coverage of his case, regardless of the sentence,[13] has already ensured that his prosecution and sentence will reach a large audience and will deter others that might take advantage of the secrecy surrounding the work of the intelligence community in order to carry out fraud offenses. In addition, the requested period of incarceration will allow Mr. Courtney to benefit from the Bureau of Prison's drug and alcohol treatment programs, which he should be required to continue while on supervised release.

Lastly, this Court should also consider that the time Mr. Courtney spends in the custody of the Bureau of Prisons, at least for the foreseeable future, will be served very differently than how it was served before the COVID-19 pandemic. Social visits have been suspended. Inmate internal

---

[13] *See* Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that *the certainty rather than the severity of punishment seems to be the most effective deterrent*."), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/cPlenaryI.pdf. (Emphasis added).

movement has also been suspended, with the exception of movement for federal and state hearings and as necessary to manage space in the various facilities.[14]  Without movement, inmates in many facilities are essentially serving a form of solitary confinement with little interaction with other inmates and very few programming opportunities.

## III.    CONCLUSION

For the foregoing reasons and any others that may appear to the Court, or that may develop at the sentencing hearing, Mr. Courtney respectfully requests that this Court impose a period of incarceration of 37 months.


Date:  October 16, 2020                    Respectfully submitted,

                                           GARRISON KENNETH COURTNEY
                                           By Counsel


                                           /s/_____
                                           Stuart A. Sears (VSB 71436)
                                           SCHERTLER ONORATO MEAD & SEARS, LLP
                                           901 New York Avenue, N.W.
                                           Suite 500
                                           Washington, DC  20001
                                           Telephone: (202) 628-4199
                                           Facsimile: (202) 628-4177
                                           ssears@schertlerlaw.com

---

[14] *See* BOP COVID-19 Modified Operations Plan, https://www.bop.gov/coronavirus/covid19 _status.jsp.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of October, 2020, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.

/s/_____
Stuart A. Sears (VSB 71436)
SCHERTLER ONORATO MEAD & SEARS, LLP
901 New York Avenue, N.W.
Suite 500
Washington, DC  20001
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ssears@schertlerlaw.com