IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 1:20-CR-84 |
| ) | |
| GARRISON KENNETH COURTNEY, ) | Judge Liam O'Grady |
|    also known as ) | |
|       "Garrison Kenneth Pierson Courtney," ) | Sentencing: October 23, 2020 |
|       "Glenn Nelson," ) | |
|       "Glenn Nielson," ) | |
|       "Gary Pierson," ) | |
|       "Garrison Pierson," ) | |
| ) | |
|           Defendant. ) | |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

Over the span of at least four years, defendant GARRISON KENNETH COURTNEY perpetrated one of the most brazen, manipulative, and intractable fraud schemes that the undersigned prosecutors have ever encountered. He did so acting out of personal greed, demonstrated an astonishing capacity to manipulate his victims, caused well over $4.4 million in losses to his victims, and embedded himself so deeply in the fictitious world he had created that he came close to escaping prosecution. In recognition of the extraordinary nature of the fraud, the harm it caused, and the lengths to which the defendant went to deceive his victims, the government respectfully recommends that this Court impose a sentence within the advisory guideline range.

**I. The Defendant's Extraordinary Crime.**

Beginning no later than 2012, the defendant set out on a truly remarkable fraud. In a bid to steal money from unsuspecting victims, the defendant fabricated an elaborate backstory about

himself, claiming that he had served in combat during the Gulf War, had hundreds of confirmed kills in combat, had sustained injuries to his lungs from smoke caused by fires set to Iraq's oil fields, and had been wounded in an explosion during his supposed service in the Gulf War. He told his victims that he was a deep-cover operative working for the CIA and spearheading a highly classified program that had been authorized at the very highest level of the United States government. He told them that this program was of the utmost importance to national security.

With respect to some victims, he claimed that their role in the supposed program was so crucial that they themselves would be surveilled by foreign intelligence services, and that they needed to protect themselves from the supposed surveillance by altering their patterns of movement, limiting their use of credit cards, or even by carrying firearms in the event they were attacked. Indeed, the defendant portrayed himself as of such crucial importance to our nation's security that, according to him, a hostile foreign intelligence service sought to assassinate him with ricin on United States soil, and that he was so deep undercover that the CIA thereafter made all of the evidence of this supposed biochemical attack disappear.

He told his victims that he needed "commercial cover" to protect himself, the program, and by extension, our country. This cover would come in the form of placing him on the victim's payroll to mask his supposed affiliation with the CIA. The defendant assured his victims that they would be reimbursed by the government, and that they would be serving their country to boot. But it was all a sham.

Throughout this astonishing fraud, the defendant used a dizzying array of techniques to concoct, execute, and then conceal his fraud. Though it is difficult to cover every method the defendant employed, the following represents some of the dirtiest and most brazen tricks the defendant used to enrich himself and deceive others.

### A. The Defendant Manipulated His Victims By Appealing to Their Patriotism.

Throughout the scheme, the defendant sought to convince his victims that their participation in his bogus program was critical to national security. He told them that the program was of the utmost importance and had been approved at the highest levels of the United States government. He convinced his victims that the program might even be dangerous, and that our foreign adversaries would always be watching. Numerous victims and witnesses interviewed in the course of this investigation conveyed that they were drawn to the defendant's program, and were willing to participate at considerable economic cost and personal risk to themselves, because they thought they were helping their country in an important mission. The defendant exploited the best impulses of his victims for the worst of corrupt reasons.

### B. The Defendant Cloaked Himself and His Scheme in False Claims of Classification, Presenting Extraordinary Challenges to the Detection and Investigation of His Crimes.

The defendant also wrapped himself and his fraud in false claims of classification, thereby making his crimes almost impossible to expose. Beyond inventing the fraudulent backstory summarized above, the defendant went to extraordinary lengths to perpetuate this myth. He often told his victims that they did not know his real name; he insisted on meeting witnesses inside of sensitive compartmented information facilities ("SCIFs"); he made a show of searching victims for electronic devices before meetings on the false pretext of defeating foreign surveillance. He fabricated all manner of documentation, including fake correspondence from the CIA, Ex. 1, and fictitious documents purporting to issue from the Attorney General that claimed to grant *blanket, prospective immunity* to his victims for their participation in his scheme. Ex. 2. And notwithstanding that he lacked a Top Secret clearance himself, the defendant routinely insisted that potential witnesses and victims sign non-disclosure agreements that purported to subject them to criminal prosecution if they ever spoke about his activities.

3

*See, e.g.*, Ex. 3 (nondisclosure agreement counter-signed by the defendant using one of his false aliases, "Gary Pierson").

It is difficult to overstate just how pernicious this tactic was, and how dangerous and intractable it made the defendant's crimes. Investigators commonly must confront and overcome the code of silence practiced by organized crime, gang members, or corrupt public officials. But here, law enforcement was faced with ordinarily law-abiding witnesses and victims who steadfastly refused to speak because of their mistaken belief that they had a legal and patriotic duty to remain silent. In certain instances, the defendant had fooled his victims so thoroughly that years later, despite the active involvement of cleared special agents from the FBI, and investigators from the CIA's Office of Inspector General and the Intelligence Community Inspector General (who, by statute, have access to all classified information within their areas of responsibility, *see* 50 U.S.C. §§ 3033(g)(2), 3517(e)(2)), some witnesses *still* refuse to speak with the prosecution team.

### C. The Defendant Caused Unwitting Public Officials to Use Their Official Authority, and the Trappings of Their Offices, to Further the Scheme.

The defendant's false claims of classification did worse than merely causing honest people to stonewall; he caused ordinarily law-abiding public officials to use the powers of their offices in ways that, in any other context, would be reckless if not criminal.

The government's investigation of Courtney's activities remained largely covert until approximately January 2016, when agents served a grand jury subpoena on Company E, one of the companies the defendant was defrauding. After Courtney learned about the subpoena, he used several of the unwitting public officials he had sold on the validity of his program to attempt to stop the investigation.

4

Shortly after the subpoena was served, and acting on Courtney's false information, Public Official F contacted the general counsel for Company E, claimed that the FBI had no jurisdiction to conduct its investigation, and asserted that the grand jury subpoena served on Company E was void. Public Official F then purported to use his/her authority to declare that all of Company E's records in response to the subpoena were classified, and claimed that Company E would be violating the law if it produced records in response to the subpoena.

When that failed to stop the investigation, Courtney arranged for Public Official F to have an Air Force attorney directly call the prosecutor named on the subpoena, in a bid to have that prosecutor "read in" to the bogus program, thereby freezing the investigation.

The defendant eventually arranged for Public Officials F and G to meet multiple times with the lead FBI agents on this investigation to attempt to convince them to halt it. During the meetings that followed, Public Official F went so far as to threaten the FBI agents with themselves being prosecuted if they continued their investigation.

### D. The Defendant Sought to Cause Law Enforcement to Target Innocent Victims and Witnesses in a Bid to Distract Them From His Crimes.

Worse yet, Courtney developed a plan for Public Officials F and G to provide the FBI with the names of innocent persons that Courtney falsely claimed were spying for foreign governments or improperly leaking classified information in the hope that these allegations would distract the FBI from continuing to investigate his activities. Unbeknownst to Public Officials F and G, the persons in question were innocent, and Courtney had selected these individuals because he believed they might reveal his fraud to law enforcement.

For example, in February 2016, before an anticipated meeting between the FBI and Public Officials F and G, Courtney explained:

> If the FBI wants to be engaged, we can get them engaged. We give them the targets . . . . You know, they want to go after people, great, go after the CEO of a

5

> company . . . . I actually want [Public Official F] and [Public Official G] to say that today to them. Look we have targets for you guys. That's the point of what we're doing.

Session 1592.[1] Courtney added later, "To get things off the table, sometimes you have to give them things. And I think today, there's an opportunity to give them things." *Id*.

In a subsequent meeting between Public Officials F and G and the FBI, Public Official F identified four individuals whose names had been passed to him/her by Courtney, and who the FBI was urged to investigate: the CEO of Company A; a senior executive at Company E; an individual who previously had accused Courtney of fraud, and whom Courtney had falsely identified as an Iranian spy; and a senior government official who had begun to raise questions about the activities of Public Official B, another official Courtney had used in furtherance of his bogus program.

Fortunately, the FBI was aware of Courtney's ploy to misdirect law enforcement at innocent victims. But the defendant's willingness to accuse these individuals of serious crimes that he knew they did not commit shows how far he was willing to go to protect his fraud.

### E. The Defendant Came Dangerously Close to Effectively Immunizing Himself.

Moreover, the defendant had so deeply embedded himself within his fictitious world, and so fooled real public officials within the defense and intelligence communities, that he came dangerously close to effectively immunizing himself from prosecution.[2] Shortly before law enforcement intervened, investigators learned that the defendant was pressing hard for officials to sign off on a Security Classification Guide for the bogus program. This document—

---

[1] The government intercepted this call and the other calls described in this filing pursuant to a Court-authorized wiretap on Courtney's cellphone.

[2] The defendant himself recognized this. *See* PSR ¶ 109 ("So many people believed in it and were determined for the 'program' to succeed. It seemed to me like the program was actually on the verge of becoming real or legitimate given who was involved and how it was operating.")

6

sometimes referred to simply as a "class guide"—is the standard reference that informs government officials about how to treat information gained in the course of their duties, and how to determine the appropriate level of security classification. *See, e.g.*, Office of the Director of National Intelligence Classification Guide, Sept. 20, 2014, *available at* https://www.dni.gov/files/documents/FOIA/DF-2015-00044%20(Doc1).pdf.

The defendant recognized how essential this document could have been to perpetuating his fraud. For example, after learning of the government's investigation, Courtney told Public Official G that it would be good to have the class guide signed so that they "can shut that down," referring to the investigation. Session 1221. In another call, Courtney explained to Public Official F that, "we're going to have a couple opportunities still to derail this with the U.S. Attorney and the prosecutor and stuff," and that "the class guide gives you cover." Session 3673. Courtney further explained to Public Official E in another intercepted call that obtaining an attorney to represent Courtney and Individual A during the investigation would cost too much so, "[I]t's basically on [Individual A] and I to get this class guide done, and, that's the only thing that's gonna protect us I think at this point." Session 4548. Courtney added, "And I think once we have that [the class guide] we can, pretty much intercept what the, the U.S. Attorney's Office. . . . I mean we're just gonna have to have a really good game plan to, approach this outside of court." *Id*.

Fortunately, law enforcement intervened and, working with key security officials, ensured that no Security Classification Guide was ever signed for the bogus program. But it is chilling to consider what the defendant could have accomplished had he cleared this hurdle.

7

### F. The Defendant Callously Manipulated Victims and Witnesses as Unwitting Props in His Scheme.

The defendant also demonstrated an uncanny capacity to manipulate others, and use them as unwitting props in the false façade that he had constructed. Two particularly egregious examples of this tactic stand out. First, the defendant hoodwinked Individual B, a private citizen, into believing that the defendant was running a covert program for the CIA, and that Individual B was being recruited to participate in that supposed program. Once Individual B took the bait, the defendant tasked Individual B with posing falsely as various governmental officials. Individual B agreed to do so believing that he/she was somehow investigating criminal wrongdoing, but the defendant knew full well that his true purpose was to falsely inflate his own importance, and to convince his victims that they should pay him a "cover" salary under the scam that he had invented.

To execute this part of his scheme, the defendant set up a "dead drop" email account in a fictitious name that he shared with Individual B. The defendant then periodically left instructions in this email account for Individual B, thereby using him/her to scam others. For example, the defendant once instructed Individual B to pose as an official with the Department of Defense who worked "in the classified contracts section for the Undersecretary of Intelligence" and reported directly to then Undersecretary of Defense for Intelligence Michael Vickers. Ex. 4.³ The defendant instructed Individual B to advise victim Company B that the Undersecretary of Defense for Intelligence would soon be issuing a "sole source" contracting opportunity, and that Mr. Vickers had "recommended [Company B] due to Garrison Courtney's

---

³ The defendant fraudulently used Mr. Vickers's name without his knowledge, consent, or involvement. The government notes that Mr. Vickers is well known in the defense community, is described in a detailed Wikipedia entry, and was featured prominently in the book and movie *Charlie Wilson's War*.

8

connections there." *Id*. All of this was a sham: Courtney did not know and had never worked for Mr. Vickers, Individual B was not employed by the Department of Defense, and no such contracting opportunity existed.

Second, the defendant acted as a virtual puppet master in a bid to deflect suspicion by victim Company A when it began to question Courtney's legitimacy. Executives from Company A had demanded to see a supposed classified contract the company had been awarded but that Courtney refused to produce, and were trying to gain a clearer understanding of why the company had not been paid for work it had performed as a part of the bogus program. In response, the defendant orchestrated a meeting inside of a secure governmental facility where all of the participants to the meeting other than the victims would play out the scripts that he had given them.

Prior to this meeting, the defendant called an attorney who represented Company A and advised that he had just spoken "with [Public Official G] and [Public Official G] definitely wants you [and Company A executives] to come over" to Public Official G's office. Session 6734. Courtney advised that during the anticipated meeting Public Official G "may go at [Company A's CEO] a little bit hard," and would convey the message, "How much more real do I have to make this for you? . . . If you talk about this at any point in the future I'm arresting you." Session 6734. Courtney also relayed to Company A's counsel that Public Official G personally had verified the terms of the supposed contract with the government, and that the terms of the contract provided, "if you talk—if you do anything—we can cancel it, and you don't get paid." Session 6734. In truth, no contract ever had been awarded to Company A, and Public Official G had neither called for a meeting nor known of its purpose until instructed by the defendant.

9

Meanwhile, the defendant sent an email containing an "agenda" to Public Official G, wherein he explained the reason for the anticipated meeting, the supposed identities of who would attend, and the role that Public Official G should play. Ex. 5. Among other things, the defendant instructed Public Official G to "clearly state that . . . the government will seek prosecution if ANY further disclosures occur." Ex. 5. Courtney then called Public Official G to advise him/her falsely that Individual C "is legitimately my contracting officer that has this . . . he's the one that's in charge of this contract." Session 7044. But in truth, no contract existed, and Individual C was a private citizen with no authority to bind the government in any way. The defendant then directed Individual C to attend this meeting posing falsely as a CIA contracting officer.

By sheer dumb luck, the anticipated meeting never came to fruition because one of the executives of Company A had a glitch passing his clearances to the governmental facility in question. But even after the cancelled meeting, the defendant continued to press the illusion. When Company A's counsel called to "get confirmation of the information you gave me from someone else . . . speaking on behalf of the government," Courtney replied, "I think [Public Official G] can call you tomorrow. [Individual C] can call you tomorrow. . . . Every single one of them was there . . . those were people who were gonna be in the meeting. I wasn't going to be at the meeting by the way. . . . I have nothing to do with this now." Session 7450. Courtney then provided Company A's counsel with the telephone number for Individual C, and explained that Individual C would verify the existence of the supposed contract.

After hanging up the phone with Company A's counsel, Courtney immediately called Individual C:

> Hey, [Company A's counsel], who was the attorney who was supposed to be there today and then wasn't allowed to by his client . . . is gonna call you. And what I

> told him . . . I told him that you're the contracting officer, that you know, you can tell him as a second party . . . that this contract cannot be discussed below the TS/SCI [Top Secret/Sensitive Compartmented Information] level. And it is the original contract, the original DD-254,[4] yada, yada, yada, you know, type thing, but just say I can't give you the information below a TS/SCI. It just can't happen.

Session 7452. Believing that he/she was a part of some sort of covert program, Individual C obliged.

### G. The Defendant Had the Gall to Lie Directly to the Most Senior Intelligence Official in the Air Force.

The foregoing demonstrates the extraordinary lengths that the defendant took to keep his scheme alive. But it gets worse. In 2016, high-level officials with the Department of Defense, in conjunction with this investigation, were actively probing the defendant's *bona fides*. When the defendant began to perceive the roadblocks being placed in his way, he agreed to attend a meeting at the Pentagon with a lieutenant general in the Air Force. That official was then serving as the "A2", meaning that he was then the highest-ranking intelligence official within the entire United States Air Force. Unbeknownst to the defendant, the official was assisting law enforcement's investigation and agreed to record his meeting with the defendant.

Notwithstanding that the defendant was meeting in the Pentagon with the highest levels of the intelligence community, the defendant sought to convince the lieutenant general that he was participating in a real government program, and that there had simply been a breakdown in communication. In response to the lieutenant general's questions, the defendant described a fictitious meeting that he claimed was the origin of his bogus program:

> In 2013, it was, I can't remember if it was 15th or 18th of December . . . when all the Snowden fallout happened, basically the industry just got nailed. They were losing . . . about 3 trillion . . . . So they had the White House meeting. Um, I think, if I remember correctly, Dr. Vickers was there, the head of DIA was there, the head of the Agency was there, there were quite a few people there, and it was

---

[4] A DD Form 254 is a standard form used to provide private contractors the security or classification requirements associated with a contract issued by the Department of Defense.

11

> about 200 industry heads that were just getting nailed across the board. . . . There was a group of about 15 people that were told, "you're in the private sector now. We need you to coordinate with the private sector to get stuff aligned." In about 2016 January, which is now, then the government will start to work with you in order to set up the portfolio or program so that we can start putting the proper protocols in place.

Courtney went on to claim that key leaders of this supposed program left the government without properly communicating with their successors, and that the Department of Defense's inquiry into his conduct was simply a result of that miscommunication. This entire story was a figment of the defendant's imagination. And yet the defendant had the gall to claim directly to the Air Force's senior intelligence official that it was real.

### H. The Defendant Corrupted the Procurement Process, and the Damage Would Have Been Dramatically Worse Had Law Enforcement Not Disrupted the Defendant's Plot.

In perhaps the most complex aspect of his scheme, the defendant managed to embed himself at the National Institutes of Health Information Technology Acquisition and Assessment Center ("NITAAC"), and then used his position at that office to corrupt and attempt to corrupt numerous government procurements. He executed this portion of the fraud in several steps. First, the defendant fraudulently convinced Company L that he was a deep-cover operative for the CIA who needed to be paid a salary as "commercial cover" to mask his supposed affiliation with the government. Second, the defendant then approached governmental officials at NITAAC, sold them this same bogus story, and convinced those officials that NITTAC had been selected as the contracting arm for the supposed classified program.

Third, the defendant convinced NITAAC that, for national security reasons, it needed to award a contract to Company L on a noncompetitive, sole-source basis, whereby NITAAC would pay Company L to supply personnel with expertise in government acquisitions and

procurements to NITAAC. He then used this very contract as a way to legitimize himself with officials at Company L, and to install himself working at NITAAC.

Fourth, once he had installed himself at NITAAC, the defendant used his access to sensitive, nonpublic information to manipulate and attempt to manipulate federal procurements, and to attempt to steer the award of contracts administered by NITAAC to other companies where the defendant was then on the payroll.

The defendant succeeded in fraudulently steering one such contract administered by NITAAC to one of the companies where he was then on the payroll. After the crime was exposed, that contract was unwound, and the work was re-competed and awarded at a substantially lower price. But the evidence gathered by the government shows that the defendant was well on his way to corrupting a broad swath of federal procurements, and would have caused far more damage if law enforcement had not intervened.

More specifically, during the course of this investigation, law enforcement obtained a copy of a tracking spreadsheet maintained by Courtney and those working at his direction at NITAAC. Ex. 6. That spreadsheet shows that at the time investigators disrupted Courtney's plot, he was seeking to corrupt over *$3.7 billion* in federal procurements. This figure appropriately is excluded from in the parties' guideline loss calculation, given the difficulty of quantifying the exact losses the government would have sustained had the plan come to fruition. But this evidence makes clear that if the defendant had not been stopped, the damage would have been massive.

### I. The Defendant Caused Enormous Financial, Emotional, and Reputational Damage to His Victims.

The forgoing evidence and the agreed statement of facts make clear that the defendant acted through greed, and caused enormous financial losses to his victims. As set forth in the

statement of facts, the defendant defrauded at least a dozen companies out of over $4.4 million. He did so in disregard to the harm he was causing the businesses he defrauded, some of whom were extraordinarily small companies who could not absorb the blow.

What is perhaps more damaging—though more difficult to quantify—is the emotional and reputational damage he wrought on his victims. One victim notes that he/she gave up a solid position and career to assume what he/she was led to believe would be an important role assisting the government in the defendant's bogus program. Former colleagues hold that victim at arm's length, and the victim has lost job opportunities. With other victims, the defendant falsely accused them of being spies merely to create a smokescreen for his fraud. The defendant showed a callous indifference to the harm he caused these people.

### J. The Defendant Should Be Rewarded for Pleading Guilty, But Has Undermined His Claim of Acceptance of Responsibility by Continuing the Fraud After Pleading.

Without taking away from the seriousness of his crimes, the defendant deserves some degree of credit for his decision to plead guilty in this case. After being appointed counsel and receiving a detailed proffer and discovery from the government, the defendant entered into a plea agreement whereby he acknowledged his fraud. He further agreed to an extremely detailed statement of facts laying bare the crimes that he committed. He did so without quibbling over or seeming to minimize his conduct.

The value of the defendant's choice to plead guilty is considerable. Although the defendant's guilt is now clear, the sheer resources that it would have taken the government to bring this case to trial would have been substantial. The defendant has therefore saved the government and this Court significant resources by pleading guilty, and this Court should consider that fact in fashioning the ultimate sentence.

Nevertheless, the defendant has undermined his best argument for leniency by continuing with the fraud even after pleading guilty. As set forth in more detail in the government's Motion to Revoke Bond and Reply in support of that motion, *see* Dkt. Nos. 18, 23, after pleading guilty in this case, the defendant persisted in a variation of his fraudulent scheme by continuing to pose falsely as a government official within the United States intelligence community involved in a supposed classified program. The defendant's continuing criminal actions call into question whether he has any remorse for his behavior, and highlight the significant risk of recidivism that he poses.

## II. Sentencing Argument

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The sentencing court, however, "may not presume that the Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. *Id.; see also Clark*, 434 F.3d at 685. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

### A. Guidelines Range

In the plea agreement in this case, the parties acknowledged that they would jointly recommend certain guideline calculations, and that the government would not seek certain

15

guideline enhancements. *See* Dkt. No. 10 at 3-4. In an ordinary case, those recommendations would bind the government. The defendant, however, has forced the government's hand by continuing to engage in criminal activity even after pleading guilty.

As explained in more detail in the government's Motion to Revoke Bond and Reply in support of that motion, *see* Dkt. Nos. 18, 23, after the defendant pleaded guilty in this matter, he continued to perpetuate an ongoing fraud on Company N, his former employer, by falsely posing as a "duty officer" named "Devon Azzamoria" working for the Office of the Director of National Intelligence. While posing in this role, he sought to silence executives from Company N, and sought to defraud Individual D. This conduct amounts to wire fraud, in violation of 18 U.S.C. § 1343, and obstruction of justice, in violation of 18 U.S.C. § 1512(b)(2).

The plea agreement provides that "[i]f the defendant . . . commits or attempts to commit any additional federal, state or local crimes . . . then . . . [t]he United States will be released from its obligations under this agreement, including any obligation to seek a downward departure or a reduction in sentence." Dkt. No. 10 at 9. The government asks that this Court find that the defendant engaged in new criminal conduct after pleading guilty, and that the government is thereby released from its obligation to recommend or forgo the sentencing guideline provisions set forth in the plea agreement.

If the Court so finds, the government will recommend that the Court further find that the defendant's conduct triggers the two-level enhancement under U.S.S.G. § 3C1.1, and disqualifies him for credit for acceptance of responsibility under § 3E1.1. As the Senior Probation Officer correctly points out, the defendant's attempt to silence executives from Company N constitutes an attempt to willfully obstruct and impede the administration of justice with respect to the sentencing of this offense. *See* PSR at 38. And as the application notes to § 3E1.1 make clear,

"Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." § 3C1.1 note 4.

That is not to say that the Court should ignore the defendant's decision to plead guilty in this matter. The defendant's plea was still valuable to the government and this Court, and should be taken into consideration when weighing the § 3553(a) factors. But from the standpoint of the technical calculation of the Sentencing Guidelines, the government recommends that the Court find that the plea agreement has been breached, that the defendant sought to obstruct justice, that he should be assessed a 2-level enhancement under § 3C1.1, and denied the 3-level reduction under § 3E1.1.

### B. Section 3553(a) Factors

Section 3553(a) of Title 18 directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" that section. In this case, the factors set forth in § 3553(a) counsel strongly in favor a sentence within the advisory guideline range.

First, a lengthy sentence is necessary to reflect "the nature and circumstances of the offense," and in particular, "to reflect the seriousness of the offense." 18 U.S.C. § 3553(a)(1), (2). As shown above and by the statement of facts, the defendant engaged in an astounding, brazen, and calculated fraud for years on end. He used a dizzying array of tricks to cause substantial financial, reputational, and emotional damage to his victims, and would have done much worse if left unchecked. He gained access to secure governmental facilities, embedded himself inside NITAAC, and sought to corrupt an enormous array of federal procurements, all for his own enrichment.

Second, these same considerations inform the need "to promote respect for the law and to provide just punishment for the offense." § 3553(a)(2)(A). Through his conduct, and especially through his bogus claims of classification, the defendant acted as though he was above the law, and tried to convince others that they too could do anything so long as it served "the program." As noted above, the defendant handed out fake documents purporting to grant blanket immunity to potential victims and witnesses. Ex. 2. And when the scheme began to unravel and the defendant learned that Public Official G had been confronted by the FBI, he insisted that law enforcement was conducting an "illegal investigation" and that "it is absolutely illegal for them" to ask the questions they were asking. Session 8216. No one in this country is above the law, especially not those falsely claiming that everything they do is classified. The sentence should reflect this fundamental principle.

Third, the facts of this extraordinary case highlight the need to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2)(B), (C). The defendant's false claims of classification and his use of unwitting public officials to wield their authority to further the crime all highlight the extreme difficulty of detecting and dismantling a crime of this nature. Our nation's security demands that some matters remain classified, but the existence of that classification system is an opportunity for crime and abuse. A lengthy sentence is necessary to deter others who would abuse the powers of our government.

Similarly, Courtney's extraordinary capacity to deceive and manipulate others, and his brazen use of the powers of our government, reveal that he is in need of a substantial period of incapacitation. Courtney wove this scheme largely out of his own imagination, and continued with it even after pleading guilty and being outed publicly as a fraud. He has undermined his

own claim of acceptance of responsibility through his actions, and shown himself to be a continuing risk of recidivism. The government urges the Court to impose a sentence that will incapacitate a defendant who appears to need little more than his own malice to commit his crimes, and who appears to be deterred by nothing other than imprisonment.

### III. Conclusion

For all of the reasons stated above, the government respectfully recommends that the Court impose a sentence within the advisory guideline range.

Respectfully Submitted,

G. Zachary Terwilliger  
United States Attorney

Corey R. Amundson  
Chief  
Public Integrity Section

By: \_\_\_\_\_/s/\_\_\_\_\_  
Matthew Burke  
Heidi Boutros Gesch  
Assistant United States Attorneys  
Raj Parekh  
First Assistant United States Attorney  
United States Attorney's Office  
2100 Jamieson Ave  
Alexandria, VA  
Phone: 703-299-3700  
Fax: 703-299-3981

By: \_\_\_\_\_/s/\_\_\_\_\_  
Todd Gee  
Deputy Chief  
Public Integrity Section  
Special Assistant United States Attorney  
Eastern District of Virginia

CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of October, 2020, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

A copy also will be sent via email to:

>Kelly M. Smihal
>Senior United States Probation Officer
>Kelly_Smihal@vaep.uscourts.gov

>                /s/
>Matthew Burke
>Assistant United States Attorney